**No. 26-3514**
**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| ALISON KAREEM, | : | |
| Plaintiff-Appellant, | : | On Appeal from the |
| | : | United States District Court |
| v. | : | for the Northern District of Ohio |
| | : | |
| CUYAHOGA COUNTY BOARD OF | : | District Court Case No. |
| ELECTIONS, ET AL., | : | 1:20-CV-2457 |
| Defendants-Appellees, | : | |
| | : | |

---

**BRIEF OF APPELLEE OHIO SECRETARY OF STATE FRANK LaROSE**

---

D. ANDREW WILSON
Attorney General of Ohio

MATHURA J. SRIDHARAN*
Ohio Solicitor General
**Counsel of Record*
JOHN F. KERKHOFF
Chief Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
Mathura.Sridharan@OhioAGO.gov

*Counsel for Appellee*
*Ohio Secretary of State Frank LaRose*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......... iii

STATEMENT REGARDING ORAL ARGUMENT .......... x

JURISDICTIONAL STATEMENT .......... 1

STATEMENT OF THE ISSUES .......... 2

INTRODUCTION .......... 3

STATEMENT .......... 5

I. Before ballot-secrecy reforms, vote buying and voter intimidation were common. .......... 5

II. For roughly 140 years, Ohio has prohibited voters from displaying their ballots to others. .......... 10

III. Voters, including Kareem here, seek to take and post “ballot selfies.” .......... 15

IV. The District Court granted the defendants summary judgment, holding that Ohio’s ballot-secrecy statutes are constitutional. .......... 18

SUMMARY OF THE ARGUMENT .......... 21

STANDARD OF REVIEW .......... 25

ARGUMENT .......... 25

I. The Court should review Ohio’s ballot-secrecy statutes for reasonableness; at most, it should apply intermediate scrutiny. .......... 26

A. Ballots are nonpublic forums, triggering deferential First Amendment review. .......... 26

B. Ohio’s laws are both viewpoint and content neutral, so they trigger less-searching First Amendment scrutiny. .......... 34

1. The challenged statutes should be reviewed for reasonableness because ballots are nonpublic forums, and the statutes are viewpoint neutral. ..... 35

2. Even if ballots were public forums, they should be reviewed as reasonable time, place, and manner restrictions because the statutes are content neutral. ..... 36

II. Ohio's ballot-secrecy statutes need only be reasonable to pass constitutional muster but satisfy any potentially applicable standard of review, even strict scrutiny. ..... 40

A. Ohio has compelling interests in the integrity of its elections, which include preventing vote buying and voter intimidation. ..... 40

B. The challenged statutes serve Ohio's election interests while leaving open alternative paths for comparable speech. ..... 41

C. The challenged statutes satisfy any possible scrutiny. ..... 48

III. Kareem's contrary arguments are unconvincing. ..... 52

A. Strict scrutiny does not apply here. ..... 52

B. Kareem fails to identify an alternative regulatory approach that would be less restrictive but as effective. ..... 54

C. The District Court did not abuse its discretion in considering the Secretary's expert, and summary judgment was proper regardless. ..... 58

CONCLUSION ..... 60

CERTIFICATE OF COMPLIANCE ..... 62

CERTIFICATE OF SERVICE ..... 63

DESIGNATION OF DISTRICT COURT RECORD ..... 64

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Am. Freedom Def. Initiative v. Suburban Mobility Auth.*,
978 F.3d 481 (6th Cir. 2020) ........................................................*passim*

*Arbino v. Johnson & Johnson*,
116 Ohio St. 3d 468 (2007) ........................................................ 33

*Ashcroft v. ACLU*,
542 U.S. 656 (2004) ........................................................ 56

*Babb v. Maryville Anesthesiologists P.C.*,
942 F.3d 308 (6th Cir. 2019) ........................................................ 24, 58

*Brnovich v. Democratic Nat'l Comm.*,
594 U.S. 647 (2021) ........................................................ 22, 40

*Brown v. Yost*,
122 F.4th 597 (6th Cir. 2024) ........................................................ 33

*Burdick v. Takushi*,
504 U.S. 428 (1992) ........................................................ 31, 50, 51

*Burson v. Freeman*,
504 U.S. 191 (1992) ........................................................*passim*

*City of Austin v. Reagan Nat'l Adver. of Austin, LLC*,
596 U.S. 61 (2022) ........................................................*passim*

*City of Renton v. Playtime Theatres, Inc.*,
475 U.S. 41 (1986) ........................................................ 39

*Clingman v. Beaver*,
544 U.S. 581 (2005) ........................................................ 51

*Connection Distrib. Co. v. Holder*,
557 F.3d 321 (6th Cir. 2009) ........................................................ 16, 38, 39

*Cornelius v. NAACP Legal Def. & Educ. Fund*,
473 U.S. 788 (1985) ........................................................*passim*

*Crookston v. Johnson*,
841 F.3d 396 (6th Cir. 2016)........................................................................*passim*

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)...................................................................................58

*Daunt v. Benson*,
956 F.3d 396 (6th Cir. 2020).......................................................................50

*Davenport v. Washington Ed. Assn.*,
551 U.S. 177 (2007)...................................................................................39

*First Tenn. Bank Nat'l Ass'n v. Barreto*,
268 F.3d 319 (6th Cir. 2001).......................................................................58

*Free Speech Coal., Inc. v. Paxton*,
606 U.S. 461 (2025)...............................................................................36, 48

*Grooms v. State*,
83 Ohio St. 408 (1911)...............................................................................12

*Hogarth v. Hayes*,
No. 5:24-CV-481, 2026 U.S. Dist. LEXIS 66640 (E.D.N.C. Mar. 9, 2026)...........................................................................................................32

*Ison v. Madison Local Sch. Dist. Bd. of Educ.*,
3 F.4th 887 (6th Cir. 2021)..........................................................................26

*Jackson v. City of Washington*,
1905 Ohio Misc. LEXIS 192 (Ohio Comm. Pleas Ct. July 29, 1905)................13

*Jones v. Markiewicz-Qualkinbush*,
892 F.3d 935 (7th Cir. 2018).......................................................................31

*Kareem v. Cuyahoga Cnty. Bd. of Elections*,
95 F.4th 1019 (6th Cir. 2024)......................................................................18

*Kennedy v. Benson*,
119 F.4th 464 (6th Cir. 2024)..................................................................31, 33

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)...................................................................................58

*Kunkle v. Q-Mark, Inc.*,
No. 3:13-cv-82, 2013 WL 3288398 (S.D. Ohio June 28, 2013) .......................... 44

*Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
588 F.3d 908 (6th Cir. 2009) .......................... 25

*Marcellus v. Va. State Bd. of Elections*,
849 F.3d 169 (4th Cir. 2017) .......................... 31

*Marijuana Policy Project v. United States*,
304 F.3d 82 (D.C. Cir. 2002) .......................... 32

*McCullen v. Coakley*,
573 U.S. 464 (2014) .......................... 27

*Minn. Voters Alliance v. Mansky*,
585 U.S. 1 (2018) .......................... *passim*

*Newell Rubbermaid, Inc. v. Raymond Corp.*,
676 F.3d 521 (6th Cir. 2012) .......................... 59

*Ohio Council 8 Am. Fed'n of State v. Husted*,
814 F.3d 329 (6th Cir. 2016) .......................... 21, 32

*OPERS v. Fed. Home Loan Mortg. Corp.*,
188 F.4th 900 (6th Cir. 2026) .......................... 24, 58, 59

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
460 U.S. 37 (1983) .......................... 27, 35, 40, 48

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009) .......................... 28

*Protect Marriage Ill. v. Orr*,
463 F.3d 604 (7th Cir. 2006) .......................... 31

*Putnam Pit, Inc. v. City of Cookeville*,
221 F.3d 834 (6th Cir. 2000) .......................... 27, 28

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) .......................... 36, 37, 48, 53

*Reynolds v. Sims*,
377 U.S. 533 (1964) .......... 41

*Rideout v. Gardner*,
123 F. Supp. 3d 218 (N.H. Dist. 2015) .......... 54

*Rideout v. Gardner*,
838 F.3d 65 (1st Cir. 2016) .......... 53, 54, 55

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
515 U.S. 819 (1995) .......... 26, 35, 54

*Schickel v. Dilger*,
925 F.3d 858 (6th Cir. 2019) .......... 25

*Silberberg v. Bd. of Elections of N.Y.*,
272 F. Supp. 3d 454 (S.D.N.Y. 2017) .......... 18, 31

*State v. Adkins*,
No. 1307, 1982 WL 3346 (Ohio Ct. App. Jan. 20, 1982) .......... 44

*State v. Hubbard*,
No. C-920685, 1993 WL 293323 (Ohio Ct. App. Aug. 4, 1993) .......... 44

*Susan B. Anthony List v. Driehaus*,
814 F.3d 466 (6th Cir. 2016) .......... 53

*Thompson v. DeWine*,
959 F.3d 804 (6th Cir. 2020) .......... 41

*TikTok Inc. v. Garland*,
604 U.S. 56 (2025) .......... 37

*Timmons v. Twin Cities Area New Party*,
520 U.S. 351 (1997) .......... *passim*

*United Food & Commercial Workers Local 1099 v. City of Sidney*,
364 F.3d 738 (6th Cir. 2004) .......... *passim*

*United States v. Adams*,
722 F.3d 788 (6th Cir. 2013) .......... 44

*United States v. Daugherty*,
952 F.2d 969 (8th Cir. 1991) .... 44

*United States v. Johnson*,
No. 5:11-CR-143, 2012 WL 3610254 (E.D. Ky. Aug. 21, 2012) .... 44

*United States v. Madden*,
403 F.3d 347 (6th Cir. 2005) .... 44

*United States v. McCranie*,
169 F.3d 723 (11th Cir. 1999) .... 44

*United States v. Risner*,
737 F. App'x 751 (6th Cir. 2018) .... 44

*United States v. Robinson*,
813 F.3d 251 (6th Cir. 2016) .... 43

*United States v. Shatley*,
448 F.3d 264 (4th Cir. 2006) .... 44

*United States v. Shrout*,
298 F. App'x 479 (6th Cir. 2008) .... 44

*United States v. Slone*,
411 F.3d 643 (6th Cir. 2005) .... 44

*United States v. Thomas*,
510 F.3d 714 (7th Cir. 2007) .... 44

*United States v. Thompson*,
501 F. App'x 347 (6th Cir. 2012) .... 44

*United States v. Turner*,
465 F.3d 667 (6th Cir. 2006) .... 44

*United States v. Turner*,
536 F. App'x 614 (6th Cir. 2013) .... 44

*United States v. Young*,
516 F. App'x 599 (6th Cir. 2013) .... 44

*Vidal v. Elster*,
602 U.S. 286 (2024) .......... 43

*Walden v. Kosinski*,
153 F.4th 118 (2d Cir. 2025) .......... 31

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) .......... 39

*Wash. State Grange v. Wash. State Republican Party*,
552 U.S. 442 (2008) .......... 31

*Williams Yulle v. Fla. Bar*,
575 U.S. 433 (2015) .......... 49

**Statutes, Rules, and Constitutional Provisions**

28 U.S.C. §1291 .......... 1

28 U.S.C. §1331 .......... 1

Fed. R. Civ. P. 56 .......... 25

Fed. R. Evid. 702 .......... 60

82 Ohio Laws 232 .......... 14

Ohio Rev. Code §3501.35 .......... *passim*

Ohio Rev. Code §3599.20 .......... *passim*

Ohio Rev. Code §3599.40 .......... 15

U.S. Const. amend. I .......... 26

**Other Authorities**

*A County Where Selling Votes is Universal*, New York Times (Jan. 15, 1911) .......... *passim*

*The election-At the polls*, Library of Congress .......... 7

Genevieve B. Gist, *Progressive Reform in Rural Community: The Adams County Vote-Fraud Case*, 48 Miss. Valley Hist. Rev. 60 (1961)............... 10, 13, 14

George Creel & Sloan Gordon, *What Are You Going to Do About it? The Shame of Ohio*, Cosmopolitan Magazine (1911) ........................................ 12

Jay C. Heckelman, *The effect of secrecy on voter turnout rates*, 82 Pub. Choice 107 (1995) ..........................................................................................8

Jorgen Elkit & Michael Maley, *Why Ballot Secrecy Still Matters*, 30 Journal of Democracy 61 (2019) ................................................................ 45

Joseph R. Swan, Comp. Statutes of the State of Ohio, of a General Nature, in Force August, 1854 (1854) ................................................ 10

Ken Menkaus, *Elections in the Hardest Places: The Case of Somalia*, 28 Journal of Democracy 132 (2017) .............................................................. 46

*Mafia turns to 3G video phones*, BBC News (May 16, 2003) .................................. 46

Richard F. Bensel, The American Ballot Box in the Mid-Nineteenth Century (Cambridge Univ. Press 2004) ..................................................8

Richard L. Hasen, *Vote Buying*, 88 Cal. L. Rev. 1323 (2000) ..................................6

*Secrecy of the Ballot and Ballot Selfies*, Nat'l Conf. Of State Legislatures (Sept. 5, 2025) ......................................................................................10, 15

*Secretary Unveils Limited Edition America 250 "I Voted" Sticker*, Press Release (June 12, 2026)......................................................................... 47

Thomas M. Franck, *The Emerging Right to Democratic Governance*, 86 Am. J. Int'l Law 46 (1992) ...................................................................... 41

Tim Burke, *The Cox Machine*, Cincinnati History: Greater Cincinnati's Past & Present (Dec. 3, 2019)................................................................. 11

Timothy Frye, et al., *Hitting Them With Carrots: Voter Intimidation and Vote Buying in Russia*, 49 British J. Pol. Science 857 (2019) ......................... 46

*Worries about vote buying despite Mexican reforms*, CBS News (June 30, 2012)........................................................................................................ 46

## STATEMENT REGARDING ORAL ARGUMENT

To protect ballot secrecy, Ohio has long prohibited voters from exposing their ballots to others. *See* Ohio Rev. Code §§3501.35(A)(4), 3599.20. Alison Kareem brings a First Amendment challenge to those requirements. Her challenge has several problems, and the District Court correctly rejected it. But given the important role that ballot secrecy plays in Ohio elections, Ohio Secretary of State Frank LaRose requests oral argument.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction to hear Kareem's claim under 28 U.S.C. §1331. This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1. Do the longstanding ballot-secrecy requirements within Ohio Revised Code §§3501.35(A)(4) & 3599.20 violate the right to free speech under the First and Fourteenth Amendments?

2. Did the District Court abuse its discretion in considering the opinions of the Secretary's expert?

## INTRODUCTION

Once upon a time, elections "were not a very pleasant spectacle." *Burson v. Freeman*, 504 U.S. 191, 202 (1992) (plurality) (quotation omitted). Polling places felt much like a public auction. As citizens approached to vote, they were bombarded by party agents seeking to bribe their way to victory. Because voting occurred in the open, and because parties could supply their own custom ballots (often brightly colored ones), onlookers could confirm how people voted. Unsurprisingly, treating voting as a public spectacle led to rampant corruption, including frequent vote buying. Ohio was no exception. In some areas of the State, vote buying was so commonplace that people thought it universal. *A County Where Selling Votes is Universal*, New York Times (Jan. 15, 1911) (reproduced at Ex. A, R.24-1, PageID#133).

About 140 years ago, Ohio and other States introduced ballot-secrecy reforms to clean up their elections. These reforms were wildly successful: as a result, citizens today vote in secret, without facing coercion or temptation from others. *See Minn. Voters Alliance v. Mansky*, 585 U.S. 1, 6 (2018). This case involves one such reform. Ohio has long prohibited voters from exposing their ballots to others. *See* Ohio Rev. Code §§3501.35(A)(4), 3599.20. The prohibition reflects common sense. Vote-buying schemes—and other similar forms of corruption—depend on vote confirmation.

If would-be vote buyers and other bad actors cannot confirm how people vote, then their chances of effectively meddling with elections shrink dramatically.

While Ohio and other States have long required ballot secrecy, a new threat to that secrecy has emerged in recent years: smartphones. People can now snap pictures wherever they go. And with the rise of social media, many people now chronicle each waking moment online. Combining those developments, some voters now take "ballot selfies"—pictures of themselves with their ballots that they post online. For obvious reasons, ballot selfies pose a significant vote-confirmation risk. They provide an easy and seemingly innocent means by which wrongdoers can confirm how someone voted.

Through this litigation, Alison Kareem takes her desire for ballot selfies to an untenable extreme. She claims that ballot selfies are a constitutional "must" under the First Amendment. A decade ago, this Court previewed why such a claim fails. *Crookston v. Johnson*, 841 F.3d 396, 399–400 (6th Cir. 2016) (staying preliminary relief). The Court should put the issue to rest here.

Kareem's claim has two big-picture flaws. *First*, modern election ballots are not an open forum for public discourse. *Cf. United Food & Commercial Workers Local 1099 v. City of Sidney*, 364 F.3d 738, 749 (6th Cir. 2004). Because ballots are not a public forum, First Amendment review should be deferential. *See Am. Freedom Def.*

*Initiative v. Suburban Mobility Auth.*, 978 F.3d 481, 490–92 (6th Cir. 2020). *Second*, the statutes challenged here impose common-sense requirements with strong historical support. Ohio's statutes, consequently, are the type that can survive even strict scrutiny. *See Burson*, 504 U.S. at 198–208 (plurality).

All said, Ohio's ballot-secrecy statutes (1) need only satisfy deferential review, but (2) can survive demanding review. That makes for an easy case.

## STATEMENT

### I. Before ballot-secrecy reforms, vote buying and voter intimidation were common.

**A.** Today, Ohioans and other Americans vote privately and anonymously. *Mansky*, 585 U.S. at 6. But early Americans did not have such luxuries. Before ballot secrecy, elections were an unsavory process "for those who believed in democratic government." *Burson*, 504 U.S. at 202 (plurality) (quotation omitted). Among other problems, a lack of secrecy "opened the door to bribery and intimidation." *Id.* at 200–01.

The relevant history traces to before the Founding. "During the colonial period, many government officials were elected by the *viva voce* method or by the showing of hands, as was the custom in most parts of Europe." *Id.* at 200. Under that approach, voting was "not a private affair, but an open, public decision, witnessed by all." *Id.* Open voting created opportunities for improper influence, including vote buying and

voter intimidation. *Id.* Colonial Americans also inherited some bad habits from England. For example, in eighteenth-century England, the practice of "treating" voters—giving voters "food and drink in heroic quantities in order to gain their favor"—was "an evidently universal practice." Richard L. Hasen, *Vote Buying*, 88 Cal. L. Rev. 1323, 1327 (2000) (quotation omitted).

To counteract these behaviors, States in the newly formed Union soon "incorporated the paper ballot into their" election systems. *Burson*, 504 U.S. at 200 (plurality). Under those systems, voters would deposit "privately prepared," "premade ballots" at public locations. *Mansky*, 585 U.S. at 6. But early polling places "often consisted simply of a 'voting window' through which the voter would hand his ballot to an election official situated in a separate room with the ballot box." *Id.* So voting was still in public, "frequently within view of interested onlookers." *Id.*

Early polling places were "akin to … an open auction place." *Id.* at 7 (quotation omitted). "Electioneering of all kinds was permitted." *Id.* "Crowds would gather to heckle and harass voters who appeared to be supporting the other side." *Id.* And interested parties would even engage in "[s]ham battles" (that is, staged fights) "to keep away elderly and timid voters of the opposition." *Burson*, 504 U.S. at 202 (plurality). This 1857 political cartoon paints the sordid picture:



*The election—At the polls*, Library of Congress, https://www.loc.gov/pictures/item/97512416/. Early election customs thus taught that a person needed to possess at least "ordinary courage" to "be able to make his way to the voting window." *Mansky*, 585 U.S. at 7 (quotation omitted).

Those seeking to rig elections took advantage of these raucous settings. Political parties created their own ballots for voters—the "party ticket," so to speak. *Burson*, 504 U.S. at 200, 202 (plurality). These ballots were "often printed with flamboyant colors, distinctive designs, and emblems so that they could be recognized at a

distance." *Id.* at 200. That way, any vote buyer could watch at a distance to confirm that those selling their votes placed the party ticket in the polling box. *Id.* Thus, under these early ballot systems, "elections were routinely bought and sold" through an "active vote market." Jay C. Heckelman, *The effect of secrecy on voter turnout rates*, 82 Pub. Choice 107, 108–09 (1995) (collecting authority); *see also Burson*, 504 U.S. at 201 & n.6 (plurality); Dr. E. Scott Adler Expert Report, R.24-3, PageID#237.

The costs of votes varied. By some accounts, "[a]t least a dollar was the most common sum men reported as the going rate for votes at most precincts in the middle of the nineteenth century." Richard F. Bensel, The American Ballot Box in the Mid-Nineteenth Century 59 (Cambridge Univ. Press 2004). "In a close election, however, the price of a man's vote could skyrocket." *Id.* at 58 n.73. As one illustration, during a tight 1868 election in Middletown, New York, "bidding apparently rose to over twenty-five dollars" for a vote. *Id.*

But whatever a vote's price, election corruption flourished under early ballot systems. Because voting remained public, "the evils associated with the earlier *viva voce* system reinfected the election process." *Burson*, 504 U.S. at 200 (plurality).

**B.** These problems were "not unique" to the United States. *Id.* at 202. And an influential solution emerged from down under: "Australian provinces adopted a

series of reforms intended to secure the secrecy of an elector's vote." *Id.* Such reforms included "an official ballot, encompassing all candidates of all parties on the same ticket." *Id.* And, to "preserve the secrecy of the ballot," Australian reforms used "polling booths" where electors could cast votes in private. *Id.*

In the late 1800s, Australian-ballot reforms gained traction in the United States. *Id.* at 203. Advocates argued that adopting the reforms "would diminish the growing evil of bribery by removing the knowledge of whether it had been successful." *Id.* And they urged that such reforms "would protect the weak and dependent against intimidation and coercion by employers and creditors." *Id.* Reformers also submitted that reducing "effectiveness of bribery and intimidation," would bring about "order and decency at the polls." *Id.*

Starting in 1888, States and localities began adopting Australian-ballot systems. *Id.* It did not take long for these systems to become popular. By 1896, "nearly every State adopted the secret ballot" in some form. *Mansky*, 585 U.S. at 7. Most voters now take as a given that they may "mark their state-printed ballots on-site and in secret." *Id.* Additionally, many States reinforce the expectation of ballot secrecy by prohibiting voters from revealing their ballots to others. *See* Adler Report, R.24-3, PageID#240 & n.2 (collecting examples); *cf. also Secrecy of the Ballot and Ballot*

*Selfies*, Nat'l Conf. Of State Legislatures (Sept. 5, 2025), https://perma.cc/XG3J-EDWP (compiling different approaches to ballot selfies).

## II. For roughly 140 years, Ohio has prohibited voters from displaying their ballots to others.

**A.** Ohio's experience tracks this country's broader history. For most of the nineteenth century, Ohio lacked a secret ballot. An early Ohio law even *required* electors to deposit their ballots "in full view of the people assembled at the polls." Joseph R. Swan, Comp. Statutes of the State of Ohio, of a General Nature, in Force August, 1854 (1854) (reproduced at Ex. D, R.24-4, PageID#283).

This open-view approach led to the same problems discussed above. Historical accounts reflect that vote selling, vote buying, and voter intimidation were common during Ohio's first century. For instance, during one 1866 election, a mother in Knox County attempted to sell her son's vote. Bensel, The American Ballot Box at 47–48. The same year, a saloon in Newark, Ohio served as the setting for separate, and much more extensive, vote-buying negotiations. *See id.* at 70–73. Other vote-buying and similar activities occurred across the Buckeye State. *See id.* at 3 n.3 (Mount Vernon); *id.* at 48–49 (Coshocton); *id.* at 60–61 (Licking County); Genevieve B. Gist, *Progressive Reform in Rural Community: The Adams County Vote-Fraud Case*, 48 Miss. Valley Hist. Rev. 60, 62 (1961) (West Union).

While much vote buying involved money, party agents used many different currencies. Adler Report, R.24-3, PageID#237. Votes, for example, might be traded for a drink, a bushel of corn, or a sack of flour. *Id.*; Bensel, The American Ballot Box at 57–60. One especially memorable exchange involved a voter's sheep. A party agent reportedly informed the voter that his candidate had a "very nice buck" that had "taken the first premium at the State fair." Bensel, The American Ballot Box at 62 (quotation omitted). The agent then suggested that, in exchange for a favorable vote, the buck might breed with the voter's "very nice ewe." *Id.* (quotation omitted).

Vote buying became part of the culture in many areas of Ohio. For example, "vote buying was relatively commonplace in Boss George Cox's pre-turn-of-the-century Cincinnati prior to the adoption of the secret ballot." Adler Report, R.24-3, PageID#238 (citing Tim Burke, *The Cox Machine*, Cincinnati History: Greater Cincinnati's Past & Present (Dec. 3, 2019), https://perma.cc/A5AP-3JEM). Boss Cox also controlled thousands of jobs, which he used as leverage during elections. *Id.*, PageID#246–47. Those who owed their jobs to Boss Cox understood that their positions depended on influencing the votes of family and neighbors. *Id.*, PageID#247.

Consider, also, the checkered history of Adams County, Ohio. There, "boodling"—votes being "bought and sold openly"—was routine for decades. *A County Where Selling Votes is Universal*, New York Times. By some accounts, the

county's boodling habit dated back to the 1860s. Adler Report, R.24-3, PageID#238; *A County Where Selling Votes is Universal*, New York Times. For instance, Judge Albion Z. Blair—a central figure in local reform efforts—described how he had witnessed men standing on street corners "auction[ing] off votes to the highest bidder, with the mayor and prosecutor looking on." George Creel & Sloan Gordon, *What Are You Going to Do About it? The Shame of Ohio*, Cosmopolitan Magazine, 600 (1911).

Vote buying within Adams County became even more prominent during the 1880s. *Id.* at 604. The practice became so widespread that bribes "caught many a respectable citizen who saw 'no sense' in letting money get away when 'everybody seemed to be taking it.'" *Id.* By 1890, boodling, at one time "secret and shameful," had become "open and authorized, attained to the dignity of habit." *Id.* Thus, for roughly "twenty-five years," votes were openly sold "without shame." *A County Where Selling Votes is Universal*, New York Times.

As discussed below, Ohio introduced the secret ballot during the 1890s. That reform temporarily "put a check on" vote buying in Adams County. *A County Where Selling Votes is Universal*, New York Times. But it took a few decades for the county's vote-buying habits to subside. *E.g.*, *Grooms v. State*, 83 Ohio St. 408, 411 (1911). Indeed, "[s]o intrenched was the employment of boodle that Adams County

electors regarded it as rightful compensation for time spent in going to the polls." Gist, *Progressive Reform*, 48 Miss. Valley Hist. Rev. at 63.

To keep bribery effective despite the secret ballot, the county's vote buyers employed "alternative means of confirming the execution of vote buying transactions." Adler Report, R.24-3, PageID#246. For example, one "ingenious" scheme required voters to mark their ballots over "a sheet of carbon paper." *A County Where Selling Votes is Universal*, New York Times; *see also Jackson v. City of Washington*, 1905 Ohio Misc. LEXIS 192, *26 (Ohio Comm. Pleas Ct. July 29, 1905). Other vote buyers simply used corrupt election officials to "shake open" completed ballots or otherwise confirm how voters marked their ballots. Gist, *Progressive Reform*, 48 Miss. Valley Hist. Rev. at 63.

Ultimately, it took widescale prosecution to reverse Adams County's vote-buying culture. In 1910, a criminal investigation resulted in charges against roughly a third of the county's eligible voters (about 1,700 people). *See* Adler Report, R.24-3, PageID#246; Gist, *Progressive Reform*, 48 Miss. Valley Hist. Rev. at 65, 68–69, 77; *A County Where Selling Votes is Universal*, New York Times. This investigation, and the negative publicity it incited, caught the attention of other Ohioans, too. Many at the time believed that there was nothing unique about the vote-buying practices in Adams County. *See* Gist, *Progressive Reform*, 48 Miss. Valley Hist. Rev. at 74–75.

And the people of several neighboring counties (including Brown, Highland, Lawrence, Scioto, and Pike) took actions to deter vote buying. *See id.* at 75.

**B.** Following other States' lead, Ohio adopted Australian ballot reforms in 1891. *See* 88 Ohio Laws 449–68 (reproduced at Ex. F, R.24-6, PageID#300–19); Adler Report, R.24-3, PageID#239. Ohio standardized its ballot and established private voting booths where electors could mark their ballots while "screened from the observations of others." 88 Ohio Laws at 458–60, R.24-6, PageID#309–11. The 1891 legislation also detailed ballot-casting procedures. *Id.* at 460–62, Page ID#311–13. And it outlawed bribery and intimidation during elections. *Id.* at 466–68, PageID#317–19.

The 1891 legislation also restricted people's ability to display their ballots. The legislation prohibited any elector from allowing "his ballot to be seen by any person, with an apparent intention of letting it be known how he is about to vote." *Id.* at 464, PageID#315. That restriction built on a preexisting law, enacted in 1885, which prohibited Ohio voters from displaying "any ballot which he intends to cast, so as to reveal its contents," within 100 feet of a polling place. 82 Ohio Laws 232, 235–36.

These restrictions still exist today. Two Ohio statutes—the "ballot-secrecy statutes"—lie at the heart of this case. *See* Ohio Rev. Code §§3501.35, 3599.20. The first statute prohibits an elector from "[e]xhibit[ing] any ticket or ballot which the

elector intends to cast." Ohio Rev. Code §3501.35(A)(4). A violation is a first-degree misdemeanor. Ohio Rev. Code §3599.40. The second statute prohibits an elector from "allow[ing] the elector's ballot to be seen by another …, with the apparent intention of letting it be known how the elector is about to vote." Ohio Rev. Code §3599.20. A violation is a fifth-degree felony. *Id.* Together, both prohibit an elector from showing to another a ballot he intends to cast.

## III. Voters, including Kareem here, seek to take and post "ballot selfies."

Against this backdrop, consider some modern developments. Two decades ago, "Apple introduced a cell phone capable of taking photographs and uploading them to the Internet." *Crookston*, 841 F.3d at 397. That advancement, combined with the growing prevalence of social media, paved the way for "ballot selfies." As the colloquial label suggests, ballot selfies are pictures voters take with their ballots. *See Secrecy of the Ballot and Ballot Selfies*, Nat'l Conf. Of State Legislatures. Despite ballot-secrecy laws in Ohio and elsewhere, some voters take and share ballot selfies online.

A decade ago, this Court faced its first ballot-selfie challenge involving Michigan's ban on photography at the polling places. *Crookston*, 841 F.3d at 396. This Court stayed the preliminary injunction granted to the plaintiff, Crookston. *Id.* at 398. It did so for "many reasons," including because Crookston had "unreasonably

delayed bringing his claim." *Id.* at 398. But, as Judge Sutton's opinion memorialized, the Court was "skeptical" of "Crookston's odds of success on the merits." *Id.* at 399. Michigan's "ban on photography at the polls," the Court explained, seemed "to be a content-neutral regulation that reasonably protects voters' privacy—and honors a long tradition of protecting the secret ballot." *Id.* at 399–400 (citing *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 328 (6th Cir. 2009) (*en banc*)). And even if the ban was "not content neutral," the Supreme Court had "upheld content-specific speech restrictions in polling places before." *Id.* at 400 (citing *Burson*, 504 U.S. 191).

The *Crookston* panel then detailed why Michigan's law likely survived any applicable scrutiny. The challenged law advanced "several serious governmental interests," like "preserving the privacy of other voters, avoiding delays and distractions at the polls, preventing vote buying, and preventing voter intimidation." *Id.* And "the links between" these election problems and "ballot exposure," "are not some historical accident; they are common sense." *Id.* (quotation omitted). True, Michigan's photography ban limited some forms of expressive activity, including ballot selfies. But social media users, this Court observed, still "can (and do) post thousands of words about whom they vote for and why." *Id.*

Alison Kareem also wants to take and post ballot selfies. Roughly a decade ago, Kareem took a picture of her ballot and posted it online. *See* Kareem Depo., R.24-2, PageID#181–84, 193. She later learned that it was illegal to post a ballot selfie online, so she took down her post. *Id.*, PageID#184–85. Kareem again took a photo of herself with her ballot in 2020. *Id.*, PageID#204. But she did not post that photo online. *Id.*, PageID#174. No government official has ever threatened Kareem with prosecution or contacted her about ballot-selfies. *Id.*, PageID#206–07. But Kareem estimates that, if it were not for Ohio's ballot-secrecy statutes, she would have "taken, posted, and disseminated" ballot selfies during other elections. Kareem Decl., R.28, PageID#570.

A few days after voting in the 2020 election, Kareem filed this lawsuit. *See* Compl., R.1, PageID#1, 8–9. She brought a single claim, arguing that Ohio's ballot-secrecy statutes violate her speech rights under the First and Fourteenth Amendments. *Id.*, PageID#10–11. Kareem sued Ohio's Secretary of State, along with the Cuyahoga County Prosecutor and Board of Elections. *Id.*, PageID#3.

The parties cross-moved for summary judgment in 2022. The Secretary, for his part, argued that the defendants were entitled to summary judgment because Kareem lacked standing *and* because her claim lacked merit. Sec'y Mot., R.24, PageID#94–131.

To support his merits argument, the Secretary submitted the expert report of Professor E. Scott Adler. (Kareem did not submit any expert evidence.) Professor Adler teaches political science at the University of Colorado. Adler Report, R.24-3, PageID#264. His focuses include election history and administration. *Id.* In 2017, Professor Adler testified at trial during a similar case involving New York's prohibition against ballot selfies. *Silberberg v. Bd. of Elections of N.Y.*, 272 F. Supp. 3d 454, 463–64 (S.D.N.Y. 2017). In this case, Professor Adler opined—in light of both historical considerations and academic materials—that ballot selfies pose a serious threat to election integrity. Adler Report, R.24-3, PageID#234–56.

### IV. The District Court granted the defendants summary judgment, holding that Ohio's ballot-secrecy statutes are constitutional.

The District Court initially granted the defendants summary judgment on standing. Op., R.40, PageID#1062–75. But, during an earlier appeal, this Court held that Kareem faced a sufficient threat of prosecution to confer standing. *Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019, 1027 (6th Cir. 2024).

Upon remand, the District Court again granted the defendants summary judgment, this time on the merits. Op., R.52, PageID#1119–47. It acknowledged that federal courts have analyzed the constitutionality of ballot-selfie restrictions differently. *Id.* at PageID#1128–37. The District Court concluded that Ohio's ballot-

secrecy statutes were content neutral and subject to intermediate scrutiny. *Id.* at PageID#1137–38.

Applying intermediate scrutiny, the District Court held that Ohio's statutes were narrowly tailored to significant state interests. *Id.* at PageID#1138–43. It first recognized that Ohio has compelling interests in preventing election "evils" such as voter fraud and intimidation. *Id.* at PageID#1140 (quotation omitted). The Court found Kareem's desire for ballot-selfies less weighty. There were many other ways, the Court emphasized, that Kareem could use social media to communicate about "how she voted." *Id.* at PageID#1142.

The District Court next held that the challenged statutes were narrowly tailored to Ohio's interests. *Id.* at PageID#1143. The challenged statutes, the Court stressed, "prohibit only the exhibition or display of a ballot the voter intends to cast." *Id.* at PageID#1142. And displaying one's ballot, the Court continued, "is the most reliable means of vote confirmation, an essential component of vote-buying and voter-intimidation schemes." *Id.* Echoing this Court's words, the District Court concluded that while "the loss of any potential First Amendment freedom deserves serious consideration," Ohio's interests in election integrity "outweigh any imposition on the expressive rights of … would-be selfie-takers." *Id.* at PageID#1145 (quoting *Crookston*, 841 F.3d at 400).

Finally, the District Court held that it could properly consider Professor Adler's report. *Id.*, PageID#1144–45. The Court recognized that, in reaching his opinions, Professor Adler drew "from a range of historical sources and contemporary research related to election privacy and integrity." *Id.*, PageID#1145. The Court found that approach acceptable "in the field of political science." *Id.*

Kareem then filed this appeal.

## SUMMARY OF THE ARGUMENT

**I.** Ohio's ballot-secrecy statutes should receive deferential review.

**A.** When States regulate speech in government-controlled spaces, the First Amendment scrutiny level depends on the forum. Forums fall within one of three categories: traditional public forums, designated public forums, and nonpublic forums. *Mansky*, 585 U.S. at 11. The first two categories involve forums that—by tradition or designation—are open for public discourse. *Id.* Nonpublic forums, contrastingly, involve spaces of limited discourse, where public communication is less fitting. *Id.* For nonpublic forums, States have "more flexibility" to regulate speech. *Id.* Such regulation need merely be reasonable and viewpoint neutral. *Id.* at 12.

This case involves election ballots, which are nonpublic forums. The Supreme Court has already held that polling places are nonpublic forums. *Id.* And, like polling places, ballots are for voting, not general "political expression." *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 363 (1997); *accord United Food*, 364 F.3d at 749 (polling places); *Ohio Council 8 Am. Fed'n of State v. Husted*, 814 F.3d 329, 336 (6th Cir. 2016) (ballots). Because a ballot is a nonpublic forum, and because Ohio's ballot-secrecy statutes regulate the use of the ballot itself, Ohio's statutes need only be reasonable and viewpoint neutral . *See Am. Freedom*, 978 F.3d at 491.

**B.** The challenged statutes are viewpoint and content neutral, so they trigger less-searching First Amendment scrutiny regardless of whether this Court agrees that ballots are nonpublic forums. They flatly restrict voters from showing their ballots to others. *See* Ohio Rev. Code §§3501.35(A)(4), 3599.20. The statutes apply regardless of how people vote or what views they hold. Because ballots are nonpublic forums and viewpoint neutral, they need only be reasonable.

States may generally regulate nonpublic forums through content-based restrictions. But, to the extent it matters, the challenged statutes are also content neutral. Laws are content neutral if the "substantive message" of any regulated speech "is irrelevant" to their application. *City of Austin v. Reagan Nat'l Adver. of Austin, LLC*, 596 U.S. 61, 71 (2022). Such is the case here. Voters cannot display their ballots regardless of how—or even if—they mark their ballots. So a ballot's substantive message does not affect the challenged statutes' application. Thus the statutes trigger *at most* reasonable-time-place-manner review, should the Court decide that ballots are public forums.

**II.** The challenged statutes satisfy any standard of mean-ends balancing that could apply here.

**A.** Ohio has a compelling interest in running fair and free elections. *See, e.g.*, *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 685 (2021); *Burson*, 504 U.S. at

198–99 (plurality). Derivative of this interest, Ohio has compelling interests in stopping "vote buying" and "voter intimidation." *See Crookston*, 841 F.3d at 400.

**B.** Ohio's ballot-secrecy statutes are well tailored to these interests. To be effective, vote-buying and voter-intimidation schemes depend on confirming how someone voted. Ballot secrecy—including in the ballot-selfie context—makes vote confirmation more difficult, dramatically reducing "bribery and intimidation." *See Burson*, 504 U.S. at 203 (plurality). Before ballot secrecy, vote buying and voter intimidation were huge problems. *See id.* at 200–02. But even setting that history aside, "the links between" vote buying and prohibiting "ballot exposure" are "common sense." *Crookston*, 841 F.3d at 400 (quotation omitted).

**C.** Given the close fit between means and ends, Ohio's statutes survive even strict scrutiny. The Supreme Court's precedent illustrates as much. *See id.* In *Burson*, the High Court considered a Tennessee law prohibiting voter solicitation within 100 feet of polling places. A plurality of the Court determined that the law survived even strict scrutiny. *Burson*, 504 U.S. at 198–211 (plurality). Here, the relationship between means (requiring ballot secrecy) and ends (preventing election corruption) is even tighter than in *Burson*.

**III.** Kareem's contrary arguments are wrong.

**A.** Kareem argues that strict scrutiny should apply. But she does not consider whether election ballots are nonpublic forums. Relatedly, Kareem argues that Ohio's statutes are content based. But her content-based argument ignores the Supreme Court's recent guidance in *Austin*.

**B.** As for tailoring, Kareem implicitly concedes that Ohio has compelling interests in election integrity. But she feigns ignorance as to how ballot selfies pose a threat. In doing so, Kareem asks this Court to overlook history and the commonsense link between vote confirmation and ballot selfies. *See Crookston*, 841 F.3d at 400. Kareem also fails to identify any alternative approach that would be less restrictive but still *as effective* in preventing vote buying and voter intimidation.

**C.** The District Court did not abuse its discretion in considering Professor Adler's expert report. Evidentiary rules permit qualified people to give opinions when their testimony is sufficiently reliable. *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 316 (6th Cir. 2019). And appellate courts give trial judges "broad latitude" to assess reliability. *OPERS v. Fed. Home Loan Mortg. Corp.*, 188 F.4th 900, 919 (6th Cir. 2026) (quotation omitted). Here, Professor Adler is a qualified political scientist who formed opinions about ballot selfies using common methods within his field. *See* Adler Depo., R.33-1, PageID#711–15. In considering Professor Adler's uncontroverted opinions, the District Court was well within its discretion.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo*. *Schickel v. Dilger*, 925 F.3d 858, 869 (6th Cir. 2019). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This Court reviews the admissibility of expert testimony for abuse of discretion. *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 915 (6th Cir. 2009).

## ARGUMENT

This Court should affirm, at least for some of the reasons it has already previewed. A decade ago, this Court addressed a similar ballot-selfie challenge involving Michigan's ban on photography at polling places. *Crookston v. Johnson*, 841 F.3d 396 (2016). All of the things this Court said there can be said here. Like Michigan's laws in *Crookston*, Ohio's ballot-secrecy statutes advance the State's compelling interest in running fair and orderly elections. And Ohio's statutes leave plenty of room for near-equivalent speech about voting. Thus, to affirm the ruling below, the Court need merely follow the roadmap *Crookston* laid out.

But to further unpack why Ohio prevails, the Secretary proceeds in three steps. He first describes why Ohio's ballot-secrecy statutes should receive deferential review, or intermediate scrutiny at most. He then discusses why Ohio's statutes

survive any level of constitutional scrutiny. Finally, the Secretary addresses why Kareem's various contrary arguments fail.

## I. The Court should review Ohio's ballot-secrecy statutes for reasonableness; at most, it should apply intermediate scrutiny.

The First Amendment, applicable to the States through the Fourteenth Amendment, provides that "Congress shall make no law … abridging the freedom of speech." U.S. Const. amend. I. "The strength of the First Amendment protection, and the level of justification required for a speech restriction, varies depending on the forum where the speech occurs." *Ison v. Madison Local Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 893 (6th Cir. 2021); *accord Am. Freedom Def. Initiative v. Suburban Mobility Auth.*, 978 F.3d 481, 490 (6th Cir. 2020). Determining the level of First Amendment review is often the most critical step to analysis. The Secretary thus starts there.

### A. Ballots are nonpublic forums, triggering deferential First Amendment review.

**1.** The Supreme Court applies a "forum based approach for assessing" speech restrictions for "government-controlled spaces." *Minn. Voters Alliance v. Mansky*, 585 U.S. 1, 11 (2018) (quotation omitted). Often, such analysis involves the government's physical property. But "the same principles" apply to other types of forums too, even "metaphysical" ones. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 830 (1995). Key here, a forum-based analysis applies to government-

created "channel[s] of communication." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 802 (1985); *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46–47 (1983) (school mail); *Putnam Pit, Inc. v. City of Cookeville*, 221 F.3d 834, 842 (6th Cir. 2000) (city website).

Generally, the Supreme Court's "cases recognize three types of government-controlled spaces: traditional public forums, designated public forums, and nonpublic forums." *Mansky*, 585 U.S. at 11. Traditional public forums "are areas that have historically been open to the public for speech activities." *McCullen v. Coakley*, 573 U.S. 464, 477 (2014). Classic examples include parks, streets, and sidewalks. *Mansky*, 585 U.S. at 11. For such locations, "the government may impose reasonable time, place, and manner restrictions on private speech, but restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." *Id.*

Designated public forums are areas "that have not traditionally been regarded as a public forum but which the government has intentionally opened up for that purpose." *Id.* (quotation omitted). This category captures "public property which the State has opened for use by the public as a place for expressive activity." *Perry*, 460 U.S. at 45. As one example, "university facilities opened to students" might qualify as a designated public forum. *Am. Freedom*, 978 F.3d at 491. Designated public

forums receive the same constitutional scrutiny as traditional public forums. *Mansky*, 585 U.S. at 11.

Nonpublic forums, however, lie at the other end of the spectrum. Such forums are "not by tradition or designation" open to general "public communication." *Mansky*, 585 U.S. at 11 (quotation omitted). This category captures government-controlled spaces that allow for only "limited discourse," *see Cornelius*, 473 U.S. at 802, including forums "limited to use by certain groups or dedicated solely to the discussion of certain subjects," *see Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009). Examples of nonpublic forums abound. They can be anything from a school's internal mail system, to a military facility, to a jail, to a city's website. *Am. Freedom*, 978 F.3d at 491 (citations omitted); *Putnam Pit, Inc.*, 221 F.3d at 844. (Courts sometimes refer to nonpublic forums as "limited public forums," but the same rules apply. *Am. Freedom*, 978 F.3d at 491 (quotation omitted).)

For spaces that qualify as nonpublic forums, "the government has much more flexibility to craft rules limiting speech." *Mansky*, 585 U.S. at 11–12. Like a private property owner, the government "retains the power to preserve the property under its control for the use to which it is lawfully dedicated." *Id.* at 12 (quotation omitted). In nonpublic forums, "the government may make content-based distinctions that would largely be invalid in public forums." *Am. Freedom*, 978 F.3d at 491. The

"government may reserve such a forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Mansky*, 585 U.S. at 12 (quotation omitted). Thus, to survive First Amendment review, a speech limitation involving a nonpublic forum must simply be reasonable and viewpoint neutral. *See Am. Freedom*, 978 F.3d at 491.

Governmental intent is the key to distinguishing between designated public forums and nonpublic forums. "The government does not create a public forum by inaction or by permitting limited discourse." *Cornelius*, 473 U.S. at 802. The government must instead *intend* "to designate" an area as a place for "public discourse." *Id.* In other words, public forums must "be created by purposeful governmental action, not by accident." *Am. Freedom*, 978 F.3d at 492 (quotation omitted). In determining the government's intent, courts think about the government's formal policy ("what guidelines has it set for speech?") and the government's past practices with respect to the forum ("what speech has it permitted?"). *Id.* Courts also think about the nature of a forum and its "suitability … for discourse." *Id.* Courts, as a result, should be "particularly reluctant" to declare a public forum if allowing "expressive activity" would disrupt "the principal function of" the forum. *Cornelius*, 473 U.S. at 804.

**2.** Election ballots are nonpublic forums. To understand why, begin with why a forum-based approach is necessary in the first place. Election ballots are a "government-controlled space[]." *See Mansky*, 585 U.S. at 11. At least since this country's transition to the Australian-ballot system (over a century ago), the States have controlled election ballots. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 356 (1997). To the extent that they have any communicative element at all, election ballots similarly qualify as government-created channels of communication. They are, at most, the means by which each voter communicates choices to the government. *United Food & Commercial Workers Local 1099 v. City of Sidney*, 364 F.3d 738, 749 (6th Cir. 2004). But ballots are not "forums for political expression." *Timmons*, 520 U.S. at 363. A proper First Amendment analysis thus requires asking, "what type of forum is a ballot?"

The answer is a nonpublic one. The Supreme Court has already held that a "polling place … qualifies as a nonpublic forum." *Mansky*, 585 U.S. at 12. Polling places, as "government-controlled property," are "set aside for the sole purpose of voting." *Id.* The States have not designated polling places as a location for general public discourse. In fact, the opposite—polling places are "subject to greater restriction" than public forums, with the States "strictly govern[ing] who may be present, for what purpose, and for how long." *Id.* (quotation omitted).

The Supreme Court has also spoken more directly about election ballots. And it has explained that "[b]allots serve primarily to elect candidates, not as a fora for political expression." *Timmons*, 520 U.S. at 363. It follows that people and political parties have no "right to use the ballot *itself* to send a particularized message," whether to "candidate[s]" or to "the voters." *Id.* (emphasis added). Along the same lines, the Supreme Court has also said—when upholding a ban on write-in voting—that voters possess no absolute right "to vote in any manner" or "associate for political purposes *through the ballot*." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (emphasis added). The States, in turn, have wide latitude to "ban" the ballot *itself* from serving as a "possible avenue" by which people "communicate to the public." *See Timmons*, 520 U.S. at 362.

It is not difficult to read between these lines. Many courts, justices, and judges have thus concluded that election ballots are *not* public forums. *See, e.g.*, *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 461 (2008) (Roberts, C.J., joined by Alito, J., concurring); *Kennedy v. Benson*, 119 F.4th 464, 474 (6th Cir. 2024) (Thapar, J., dissenting from denial of rehearing *en banc*); *Walden v. Kosinski*, 153 F.4th 118, 139 (2d Cir. 2025); *Jones v. Markiewicz-Qualkinbush*, 892 F.3d 935, 938 (7th Cir. 2018); *Marcellus v. Va. State Bd. of Elections*, 849 F.3d 169, 178 (4th Cir. 2017); *Protect Marriage Ill. v. Orr*, 463 F.3d 604, 606 (7th Cir. 2006); *Silberberg v. Bd.*

*of Elections of N.Y.*, 272 F. Supp. 3d 454, 475–78 (S.D.N.Y. 2017); *cf. also Marijuana Policy Project v. United States*, 304 F.3d 82, 86–87 (D.C. Cir. 2002); *Hogarth v. Hayes*, No. 5:24-CV-481, 2026 U.S. Dist. LEXIS 66640, *15–16 (E.D.N.C. Mar. 9, 2026).

This Court's cases also reinforce that ballots are nonpublic forums. In *Crookston*, for example, the Court noted that one rationale supporting Michigan's law was that the law did not involve "a traditional public forum." 841 F.3d at 400 (citing *Burson*, 504 U.S. at 216 (Scalia, J., concurring)). Although *Crookston* was a preliminary ruling, other decisions from this Court are in accord. For example, this Court has held that political parties have "no First Amendment right to use the general-election ballot for expressive activities." *Ohio Council 8 Am. Fed'n of State v. Husted*, 814 F.3d 329, 336 (6th Cir. 2016). So, for instance, there is "no right to use the ballot *itself* to educate voters." *Id.* (emphasis added).

Additionally, over a decade before *Mansky*, this Court conducted its own forum analysis involving walkways leading to polling places. *United Food*, 364 F.3d at 748. And it held that Ohio did *not* open "up a nontraditional forum for public discourse," by using "portions of school and private property for use as polling places on election day." *Id.* at 749. Polling places, the Court reasoned, were not "for public discourse" but instead for "each voter's communication of his own elective choice." *Id.* (quotation omitted). The same holds true for ballots: the communication that

occurs via ballots is not "public discourse" but instead "each voter's communication" to the government about the voter's preferences. *See id.* Such communication has long been "carried out privately—by secret ballot." *Id.* at 750. Thus, the reasoning from *United Food* already teaches that ballots are nonpublic forums. *See also Brown v. Yost*, 122 F.4th 597, 610 (6th Cir. 2024) (*en banc*) (Thapar, J., concurring) ("Ballots are geared towards structuring democratic elections, not fostering debate."); *Benson*, 119 F.4th at 474 (Thapar, J., dissenting from denial of rehearing *en banc*).

Other considerations confirm that ballots are nonpublic forums. Start with Ohio's "formal policy" in this area. *See Am. Freedom*, 978 F.3d at 492 (quotation omitted). Ohio's General Assembly "is the ultimate arbiter of public policy" for the Buckeye State. *Arbino v. Johnson & Johnson*, 116 Ohio St. 3d 468, 472 (2007) (quotation omitted). And the General Assembly has made crystal clear that ballot secrecy is the State's formal policy. *See* Ohio Rev. Code §§3501.35(A)(4), 3599.20. Ohio's past "practice" sends the same message. *See Am. Freedom*, 978 F.3d at 492 (quotation omitted). Ohio has not allowed for public discourse through its ballots; it has instead required ballot secrecy for a century-plus. *Above* 14. Consider, lastly, the "suitability" of the ballot "as a place for discourse." *See Am. Freedom*, 978 F.3d at 492. For that consideration, history teaches that when the contents of ballots are

public, corruption follows. *Above* 6–13. Classifying ballots as public forums for "expressive activity" would thus disrupt "the principal function of" elections, so the Court should be "particularly reluctant" to do so. *See Cornelius*, 473 U.S. at 804.

*

To recap, precedent, history, and basic logic all point in the same direction—election ballots are nonpublic forums. Recognizing as much greatly simplifies the First Amendment analysis. Because ballots are nonpublic forums, Ohio's statutes (which simply restrict the display of ballots) need only be reasonable and viewpoint neutral to survive First Amendment review. *See Am. Freedom*, 978 F.3d at 491.

### B. Ohio's laws are both viewpoint and content neutral, so they trigger less-searching First Amendment scrutiny.

As just-discussed, ballots are nonpublic forums, so the challenged statutes need only be viewpoint neutral and reasonable to pass constitutional muster. But, if this Court disagrees and concludes that ballots are public forums, then the challenged statutes need only be content-neutral and a reasonable time, place, and manner regulation to survive. The Secretary next explains why the challenged statutes are both viewpoint *and* content neutral. So, regardless of how the Court views ballots (as nonpublic or as public forums) the statutes should be subject to less-searching constitutional review.

### 1. The challenged statutes should be reviewed for reasonableness because ballots are nonpublic forums, and the statutes are viewpoint neutral.

Ballots are nonpublic forums, and little analysis of viewpoint neutrality is needed. Viewpoint discrimination occurs when "the rationale for" a law is to target the "ideology or the opinion or perspective of the speaker." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). The States, in other words, cannot "prohibit[] specific viewpoints" on topics they allow within a nonpublic forum. *Am. Freedom*, 978 F.3d at 498. Nor can they seek "to suppress expression merely because" they "oppose the speaker's view." *Perry*, 460 U.S. at 46.

Ohio's ballot-secrecy statutes do nothing of the sort. Recall what the two statutes prohibit. The first prohibits an elector from exhibiting "any ticket or ballot which the elector intends to cast." Ohio Rev. Code §3501.35(A)(4). The second prohibits an elector from "allow[ing] the elector's ballot to be seen by another …, with the apparent intention of letting it be known how the elector is about to vote." Ohio Rev. Code §3599.20. Neither of these prohibitions depend on how the elector votes or the elector's underlying views. Kareem, for her part, does not even attempt an argument of viewpoint discrimination. *See* Kareem Br.21–22. The Court can thus make light work of the "viewpoint" component of nonpublic-forum analysis. *See Am. Freedom*, 978 F.3d at 491. And if the Court agrees that ballots are nonpublic

forums, Ohio may "make content-based distinctions" if they avoid viewpoint discrimination. *Id.* So, if the Court agrees that ballots are nonpublic forums, it is irrelevant whether Ohio's statutes are content based. That question arises only if ballots are public forums, discussed next.

**2. Even if ballots were public forums, they should be reviewed as reasonable time, place, and manner restrictions because the statutes are content neutral.**

Even assuming ballots were public forums (or a non-government-controlled space), the challenged laws are content neutral. So they need only be reasonable time, place, and manner restrictions.

**1.** Review under the First Amendment often distinguishes between "content-based laws and content-neutral laws." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 471 (2025). Content-based laws "target speech based on its communicative content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Content-neutral laws, on the other hand, remain "agnostic as to content." *City of Austin v. Reagan Nat'l Adver. of Austin, LLC*, 596 U.S. 61, 69 (2022).

To decide whether a law is content based or content neutral, courts look to *why* the law burdens speech. A content-based restriction targets "particular speech because of" its topic, idea, or message. *Reed*, 576 U.S. at 163. The most clearly content-based laws are those that single out certain speech expressly. But even laws that

appear facially neutral may be content based if they "cannot be justified without reference to the content of the regulated speech." *TikTok Inc. v. Garland*, 604 U.S. 56, 70 (2025) (*per curiam*) (quotation omitted). The key distinguisher is whether a law's application depends on the message expressed. For example, the content-based law in *Reed* treated certain outdoors signs differently *because* they contained ideological or political messages. 576 U.S. at 159–60.

On the other hand, a law is content neutral if the "substantive message" of the regulated speech "is irrelevant" to the law's application. *Austin*, 596 U.S. at 71. The easiest content-neutral laws are those that do not require any speech being "read or hear[d]" for their enforcement. *See id.* at 72. But a law can be content-neutral even if its enforcement does "require[] reading" (or hearing) the speech in question. *Id.* at 71. In those situations, a law remains content-neutral if it does "not single out any topic or subject matter for differential treatment." *Id.* For example, the signage law in *Austin*—which distinguished between on-premise and off-premise advertising—did require "reading a billboard" to gauge whether the law applied. *Id.* But the signage law was content-neutral because the substantive "message on the sign" did not matter to the law's application. *Id.*

Applying these principles, Ohio's ballot-secrecy statutes are content neutral. *See Crookston*, 841 F.3d at 399 (noting that Michigan's "ban on photography at the polls

seems to be a content-neutral regulation"). Indeed, Ohio's statutes present an easy example of content neutrality. Again, voters violate Ohio law if they exhibit their ballots during an election, so as to reveal how they voted or intend to vote. *See* Ohio Rev. Code §§3501.35(A)(4), 3599.20. When voters engage in that conduct, they violate Ohio law *regardless* of the content of their ballots because it applies regardless of whether, how, and *if at all* a particular ballot is marked. Consider that last example. If a voter posted a ballot selfie online showing a blank ballot that he intends to cast in that manner (thus showing that the voter refused to vote for anyone or anything), the display of that ballot would still violate Ohio's ballot-secrecy requirements. So the "substantive message" of anyone's ballot "is irrelevant" to the application of Ohio law. *See Austin*, 596 U.S. at 71.

**2.** As this Court hinted in *Crookston*, a second reason exists for why ballot-secrecy requirements, like Ohio's statutes here, are content neutral. In *Crookston*, for example, this Court cited its *en banc* decision in *Connection Distributing Company v. Holder* to support the idea that Michigan's law was likely content neutral. 841 F.3d at 399–400 (citing *Connection Distrib. Co. v Holder*, 557 F.3d 321, 328 (6th Cir.) (*en banc*)).

*Connection Distributing Company* involved the secondary-effects doctrine. 557 F.3d at 328. That doctrine teaches that a law is content neutral so long as its "requirements are '*justified* without reference to the content of the regulated speech.'"

*Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Even if a law does "not entirely ignore the content of" regulated speech, it will still "be treated as content neutral" if it "addresses the collateral or 'secondary effects' of the expression, not the effect the expression itself will have on others." *Id.* (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47 (1986)).

Here, the secondary-effects doctrine confirms that the challenged statutes are content neutral. As discussed above (at 10–14), Ohio enacted its statutes to combat rampant election corruption, including pervasive vote buying. As discussed below (at 42–45), a key ingredient to such corruption was the ease of vote confirmation during this country's early years. The objective of Ohio's statutes is thus "independent of the content of" anyone's ballot and instead involves an election integrity "concern of the highest order." *Connection Distrib. Co.*, 557 F.3d at 328. Ohio's ballot-secrecy statutes target the "secondary effects" of ballot exposure that fuel vote buying and other similar forms of election corruption. Ohio's statutes, as a result, do not raise "the specter that [Ohio] may effectively drive certain ideas or viewpoints from the marketplace." *See Davenport v. Washington Ed. Assn.*, 551 U.S. 177, 188 (2007) (quotation omitted).

## II. Ohio's ballot-secrecy statutes need only be reasonable to pass constitutional muster but satisfy any potentially applicable standard of review, even strict scrutiny.

Given the above analysis, First Amendment review in this case should be deferential to Ohio law. Because election ballots are nonpublic forums, and because Ohio's statutes are viewpoint neutral, the statutes need only be "reasonable in light of the purpose which the forum at issue serves." *See Perry*, 460 U.S. at 49. And even if ballots were treated as public forums, Ohio's statutes are content neutral. Thus, even by that path, Ohio's statutes need simply be reasonable time, place, or manner restrictions. *See Mansky*, 585 U.S. at 11.

At day's end, however, Ohio's statutes survive any conceivable standard of constitutional review, even strict scrutiny. *See Burson*, 504 U.S. at 198–211 (plurality); *Crookston*, 841 F.3d at 400. Such scrutiny measures the fit between ends and means. And here, Ohio has compelling interests in its elections to which the challenged statutes are well tailored.

### A. Ohio has compelling interests in the integrity of its elections, which include preventing vote buying and voter intimidation.

Ohio and other States possess many weighty, and interrelated, election interests. Perhaps most obvious, Ohio "has a compelling interest in preserving the integrity of its election process." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 685 (2021). It also has a compelling interest in "protecting the right of its citizens to vote freely

for the candidates of their choice." *Burson*, 504 U.S. at 198–99 (plurality) (citing *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)). From those interests, it naturally follows that Ohio has compelling interests in stopping "vote buying" and "voter intimidation." *See Crookston*, 841 F.3d at 400.

On top of all that, Ohio also has compelling interests in avoiding "any appearance of coercion in the electoral process." *See Burson*, 504 U.S. at 207 (plurality). What is more, Ohio has a related interest in weeding out forms of election misconduct that might "go undetected" with only honors-system regulations. *See id.* In short, any voting behavior that raises red flags to others, or makes corruption more difficult to ferret out, triggers Ohio's compelling election interests.

Finally, Ohio has compelling interests in running orderly elections. *See Thompson v. DeWine*, 959 F.3d 804, 811 (6th Cir. 2020). Those interests include "preserving the privacy of other voters" and "avoiding delays and distractions at the polls." *Crookston*, 841 F.3d at 400.

### B. The challenged statutes serve Ohio's election interests while leaving open alternative paths for comparable speech.

Ohio's ballot-secrecy statutes advance the above interests. Begin with Ohio's interests in keeping its elections free from vote buying and other corruption. On those fronts, "the secret ballot is a central component for evaluating elections as free and fair." Adler Report, R.24-3, PageID#236 (citing Thomas M. Franck, *The*

*Emerging Right to Democratic Governance*, 86 Am. J. Int'l Law 46 (1992)). Ballot secrecy serves "two distinct" purposes. *Id.*, PageID#247. In terms of personal privacy, ballot secrecy enables voters to keep their votes to themselves. *Id.* But ballot secrecy also serves a broader state function, as it limits voters' ability "*to prove* how they voted" to others. *Id.* (emphasis added).

This second aspect of ballot secrecy matters here because, without vote confirmation, "the effectiveness of bribery and intimidation" significantly decreases. *See Burson*, 504 U.S. at 203 (plurality). Any vote-buying scheme becomes far less appealing if one removes the purchaser's "knowledge of whether" the bribe is "successful." *See id.* As academics have put it, ballot secrecy interferes with vote buying because it leads to "problematic monitoring." Adler Report, R.24-3, PageID#242 (collecting authority). Other forms of voter coercion—like employers trying to intimidate employees or landlords trying to intimidate tenants—also become less feasible if the vote cannot be confirmed. *Id.*, PageID#243–45. And "confirmable vote choices" can also pose the danger of later retribution, even if a voter never agreed to vote a certain way. *Id.*, PageID#245.

By and large, these points are "common sense." *See Crookston*, 841 F.3d at 400 (quoting *Burson*, 504 U.S. at 207 (plurality)). But this country's early history offers a stark reminder of the evils that could "reinfect[] the election process" without

ballot secrecy. *See Burson*, 504 U.S. at 200–01 (plurality). Before secret ballots, vote buying and voter intimidation were pervasive. *See id.* at 200–02. In some parts of Ohio, for example, votes were commonly auctioned off on the streets. *A County Where Selling Votes is Universal,* New York Times. A main problem in those early years was that onlookers could observe voters and "recognize[] at a distance" how they voted. *Burson*, 504 U.S. at 200 (plurality); *see also Mansky*, 585 U.S. at 6–7. Secret ballots made vote confirmation much harder, and vote buying dramatically diminished. *See* Adler Report, R.24-3, PageID#243; *see also Burson*, 504 U.S. at 204 (plurality). That is no coincidence. And, at this point, Ohio and other States have had ballot-secrecy laws in place for well over a century. *See Timmons*, 520 U.S. at 356. The "longstanding coexistence of [ballot-secrecy] regulation and the First Amendment," is a good signal that there is no constitutional problem. *See Vidal v. Elster*, 602 U.S. 286, 300 (2024).

Ohio's concerns about election corruption cannot be relegated to "a bygone electoral era." *Crookston*, 841 F.3d at 400. Elections remain important; people remain flawed; and bribes remain tempting. So, all the ingredients that mix into vote buying remain on the shelf. It is therefore no shock that, even in far more modern times, this Court and others encountered many cases involving charges of vote buying or similar misconduct. *See, e.g.*, *United States v. Robinson*, 813 F.3d 251, 254 (6th Cir.

2016); *United States v. Adams*, 722 F.3d 788, 798–99 (6th Cir. 2013); *United States v. Turner*, 465 F.3d 667, 669 (6th Cir. 2006); *United States v. Slone*, 411 F.3d 643, 644–45 (6th Cir. 2005); *United States v. Madden*, 403 F.3d 347, 348 (6th Cir. 2005); *United States v. Risner*, 737 F. App'x 751, 753–54 (6th Cir. 2018); *United States v. Turner*, 536 F. App'x 614, 615 (6th Cir. 2013); *United States v. Young*, 516 F. App'x 599, 600 (6th Cir. 2013); *United States v. Thompson*, 501 F. App'x 347, 349 (6th Cir. 2012); *United States v. Shrout*, 298 F. App'x 479, 480 (6th Cir. 2008); *United States v. Thomas*, 510 F.3d 714, 716 (7th Cir. 2007); *United States v. Shatley*, 448 F.3d 264, 265 (4th Cir. 2006); *United States v. McCranie*, 169 F.3d 723, 724–25 (11th Cir. 1999); *United States v. Daugherty*, 952 F.2d 969, 970 (8th Cir. 1991) (*per curiam*); *Kunkle v. Q-Mark, Inc.*, No. 3:13-cv-82, 2013 WL 3288398, *1 (S.D. Ohio June 28, 2013); *State v. Hubbard*, No. C-920685, 1993 WL 293323, *1 (Ohio Ct. App. Aug. 4, 1993); *State v. Adkins*, No. 1307, 1982 WL 3346, *1 (Ohio Ct. App. Jan. 20, 1982). In fact, testimony during one Kentucky-based trial indicated that, at least as of 2010, "vote buying" remained so prevalent in Breathitt County that prospective voters would go to a grocery store owned by a candidate "offering to sell their votes." *United States v. Johnson*, No. 5:11-CR-143, 2012 WL 3610254, *1 (E.D. Ky. Aug. 21, 2012).

Consider, then, the enormous risks that ballot selfies pose. Given the ubiquitous nature of cell phones, and the ease of posting photos online, ballot selfies offer "a

modern-day solution to the [vote] confirmation issues faced by would-be conspirators." Adler Report, R.24-3, PageID#248. Photos "of completed ballots" "become[] the confirmation" that electors voted in a particular way. *Id.* The "easy and reliable" nature of ballot selfies, moreover, pave the way for vote buying on an incredibly "wide scale." *Id.*, PageID#250, 253. In the olden days, vote confirmation generally depended on bad actors being present at the polls to witness each ballot. *See Burson*, 504 U.S. at 200 (plurality). But, with ballot selfies, would-be vote buyers need not be present at the polls or even "meet face-to-face" with a willing seller. Adler Report, R.24-3, PageID#248, 253. Put another way, "photographing the ballot with a mobile phone" makes life "simpler for both parties to a corrupt transaction." Jorgen Elkit & Michael Maley, *Why Ballot Secrecy Still Matters*, 30 Journal of Democracy 61, 73 (2019). And, from the perspective of election officials, allowing ballot selfies would also make election corruption incredibly difficult to detect. After all, ballot selfies permit "sellers to reveal their vote out of sight" of such officials and "under the guise of" political expression. Adler Report, R.24-3, PageID#248.

As with the Australian ballot, this is an area where this country can learn from others. *See Burson*, 504 U.S. at 202–03 (plurality). And other countries have encountered problems with smartphones being used for vote confirmation. *See* Adler Report, R.24-3, PageID#253–54. As early as 2003, reports out of Italy indicated that

mafia groups pressured voters to use phones "in the polling booth to send back images proving they had cast their ballot as instructed." *Mafia turns to 3G video phones*, BBC News (May 16, 2003), https://perma.cc/3X28-SLDJ. An article about Russian elections similarly observed that requiring "voters to take a photo of their ballot with their mobile phone before submitting it" is "an oft-publicized strategy for violating the secret ballot." Timothy Frye, et al., *Hitting Them With Carrots: Voter Intimidation and Vote Buying in Russia*, 49 British J. Pol. Science 857, 863 (2019). In Somalia, "phones were banned from voting booths" because of the ballot-secrecy problems they were causing. Ken Menkaus, *Elections in the Hardest Places: The Case of Somalia*, 28 Journal of Democracy 132, 140 (2017). And, in Mexico, there have been reports of bad actors "offer[ing] cash" to voters who were "to take cellphone photographs inside the voting booths, showing their ballot marked for a certain candidate." *Worries about vote buying despite Mexican reforms*, CBS News (June 30, 2012), https://perma.cc/Z6DB-Y4G6. Given our past track record, there is no reason to think these vote-buying and vote-confirmation problems cannot rear their ugly heads here.

Concerns about election corruption are more than enough to justify ballot secrecy. But a rise in ballot selfies would cause other problems too, both for election administrators and nearby voters. For example, as this Court noted in *Crookston*,

"posing for a ballot selfie could compromise the secrecy of another's ballot, distract other voters, and force a poll worker to intervene." 841 F.3d at 399. Consider also the frustrations of voters standing in line while an online influencer tries to capture each vote cast "with the perfect smile." *Id.* at 400. Accounting for everything that goes into making elections run smoothly, Ohio should not have to add "ballot-selfie police" to poll workers' many responsibilities.

On the other side of the ledger, Ohio's ballot-secrecy statutes do not significantly interfere with anyone's First Amendment rights. *See id.* at 400. The statutes restrict voters from using the ballot *itself* as a means of public discourse. That limited restriction leaves open many "possible avenue[s]" by which people may "communicate to the public." *See Timmons*, 520 U.S. at 362. For example, voters who want to broadcast their civic pride are free to post election-day selfies wearing I-voted stickers. *See* Ex. 3, R.26-1, PageID#431; *cf. also Secretary Unveils Limited Edition America 250 "I Voted" Sticker*, Press Release (June 12, 2026), https://perma.cc/VPC6-D39A. And, of course, "social media users can (and do) post thousands of words about whom they vote for and why." *Crookston*, 841 F.3d at 400. Voters simply cannot use the ballot to prove to others how they voted.

### C. The challenged statutes satisfy any possible scrutiny.

Bringing all of this together, Ohio's ballot-secrecy statutes are an eminently reasonable measure that advances state interests of the highest order. They thus satisfy every form of First Amendment scrutiny that could apply.

Initially, the statutes easily clear the reasonableness hurdles associated with non-public and traditional public forums. Protecting against vote confirmation, and the evils vote confirmation leads to, undoubtedly qualifies as "reasonable in light of the purpose which" ballots and elections are supposed to serve. *See Perry*, 460 U.S. at 49. Along similar lines, Ohio's statutes also qualify as a "reasonable time, place, and manner restriction[]." *See Mansky*, 585 U.S. at 11. Again, Ohio's statutes do not prevent anyone from using pictures or words to demonstrate whether they voted or how they voted. *See Crookston*, 841 F.3d at 400. The statutes regulate only the *manner* of that communication, by preventing voters from co-opting the ballot itself.

Ohio's ballot-secrecy statutes also satisfy heightened scrutiny. Under intermediate First Amendment scrutiny, "a law will survive review if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Paxton*, 606 U.S. at 471 (quotation omitted). But to survive strict scrutiny, a law must be "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163.

While strict scrutiny is demanding, it does not require perfection. *Williams Yulle v. Fla. Bar*, 575 U.S. 433, 454 (2015) (plurality). And it recognizes that not all problems the States face are conducive to cut-and-dry "proof by documentary record." *See id.* at 447.

As this Court foreshadowed in *Crookston*, Ohio's ballot-secrecy statutes meet even strict scrutiny. *See* 841 F.3d at 400. A closer look at the Supreme Court's decision in *Burson* illustrates why. That case involved a Tennessee law prohibiting the solicitation of votes within 100 feet of a polling place. *Burson*, 504 U.S. at 193 (plurality). A plurality of the Court applied strict scrutiny. *Id.* at 198. But the Court upheld the law nonetheless. The plurality recognized that Tennessee had compelling interests in the integrity of elections and allowing its citizens to vote freely without improper influence. *Id.* at 198–99. The plurality also concluded that Tennessee's law was properly tailored. It stressed this country's sorted election past, involving non-secret ballots and public-auction-like polling places. *Id.* at 200–05. Considering that history, and applying a bit of "common sense," the plurality determined that it was necessary to have a "restricted zone around the voting area" to "preserve the secrecy of the ballot." *Id.* at 207–08.

*Burson*'s analysis applies seamlessly here. Like Tennessee, Ohio has compelling interests in election integrity and enabling its citizens to vote freely, without fraud or

intimidation. Like the challenged law in *Burson*, the challenged statutes here have a "long history" that traces back to this country's early struggles with elections. *See Burson*, 504 U.S. at 211 (plurality). And like the law in *Burson*, Ohio's statutes are a necessary measure "to preserve the secrecy of the ballot" and thus prevent the "evils associated" with non-secret election processes. *See id.* at 200, 207–08. In truth, the fit between means and ends is much snugger here than in *Burson*. When it comes to preventing vote buying and voter intimidation, vote confirmation is a *much* bigger problem than political advocacy occurring 90 feet away from a polling place. *See above* 42–44. As this Court said in *Crookston*, the "links between" election fraud "and the prohibition on ballot exposure are not some historical accident; they are 'common sense.'" 841 F.3d at 400 (quoting *Burson*, 504 U.S. at 207 (plurality)).

One last constitutional standard warrants some discussion. The Supreme Court has crafted the *Anderson-Burdick* balancing test to address claims involving the right to vote and access to the ballot. That test is a flexible one, under which courts balance the burdens a law imposes against the interests a law serves. *See Burdick*, 504 U.S. at 434. The standard is an awkward fit here, as this case does not involve any burden on ballot access or the right to vote. Even so, this Court has at times looked to the *Anderson-Burdick* test when considering other election-related First Amendment claims. *See Daunt v. Benson*, 956 F.3d 396, 406 (6th Cir. 2020). To the extent

*Anderson-Burdick* applies here, Ohio's ballot-secrecy statutes readily satisfy the test. Because the statutes do not impose severe burdens on speech rights, *above* 47, any review should be deferential, *see Clingman v. Beaver*, 544 U.S. 581, 586–87 (2005). And Ohio's interests in its elections markedly "outweigh any imposition on the expressive rights of … would-be selfie-takers." *See Crookston*, 841 F.3d at 400.

While the *Anderson-Burick* test does not precisely fit this case, the underlying tenets of the test are still useful. The test embraces the premise that, to have fair and orderly elections, the States must impose many election rules. *Burdick*, 504 U.S. at 433. That remains so even though such rules will "invariably impose some burden upon" individual rights. *Id.* Given those realities, the mere fact that an election law burdens individual rights is not enough to justify "strict scrutiny." *Id.* The same realities are all present here. So, if nothing else, *Anderson-Burdick* strongly signals that strict scrutiny is inappropriate. A restriction on ballot selfies is exactly the type of reasonable, nondiscriminatory election regulation that almost always satisfies constitutional review. *See Clingman*, 544 U.S. at 586–87. And the Supreme Court's *Anderson-Burdick* cases also teach that voters possess no "absolute" right "to associate for political purposes *through the ballot.*" *Burdick*, 504 U.S. at 433 (emphasis added). That surely weakens any claim of a right to post ballot-selfies.

## III. Kareem's contrary arguments are unconvincing.

Kareem's arguments all miss the mark. She misstates the applicable standard, misapplies her preferred standard, and mishandles the expert evidence.

### A. Strict scrutiny does not apply here.

Kareem argues for strict scrutiny, but she makes many errors along the way. She begins her level-of-review analysis in the middle, asking whether Ohio's statutes are content based. *See* Kareem Br.14–15. But before reaching that question, one must decide what type of forum ballots constitute. *Above* 26–33. The Secretary of course agrees with Kareem that election ballots are "about the election." Kareem Br.17. But that reality reinforces that ballots facilitate a government-controlled process; they are not an open forum for public discourse. *See Timmons*, 520 U.S. at 363. This case's election context also reinforces that free-speech rights are *not* the only important rights at stake here. Rather, this case simultaneously involves "another fundamental right, the right to cast a ballot in an election free from the taint of intimidation and fraud." *Burson*, 504 U.S. at 211 (plurality).

Even setting all that aside, Kareem misframes her content-based analysis. She stresses that she is challenging Ohio's statutes only as applied to ballot selfies. *See* Kareem Br.11–14. From there, Kareem argues about whether a hypothetical law—one apparently banning *only* ballot selfies—would be content based. *See* Kareem

Br.15. But analysis about content neutrality focuses on the "distinctions" a law itself draws, not on the distinctions a challenger wishes a law drew. *See Reed*, 576 U.S. at 163–64. Kareem, it follows, cannot pretend that Ohio's ballot-secrecy statutes selectively target displaying "photographs" or "marked ballot[s]." *Contra* Kareem Br.15; *see also above* 38 (discussing a blank-ballot scenario). Ohio law disallows *any* display of *any* ballot intended to be cast (fully marked or otherwise).

Kareem's content-based analysis also skips past binding precedent. She relies heavily on the Supreme Court's decision in *Reed*. But after *Reed*, the Supreme Court clarified the test for content neutrality within *Austin*. Kareem never grapples with *Austin*. So she never explains how Ohio's ballot-exposure restrictions depend on the "substantive message" within anyone's ballot. *See Austin*, 596 U.S. at 71. They do not. Kareem further points to this Court's inapposite decision *Susan B. Anthony List v. Driehaus*, 814 F.3d 466 (6th Cir. 2016). Kareem Br.17–18. The statute challenged there expressly regulated false statements; the statutes challenged here do not. *See id.* at 469–70.

Kareem's reliance on non-binding cases is likewise misplaced. For example, Kareem leans on the First Circuit's decision in *Rideout v. Gardner*, 838 F.3d 65 (1st Cir. 2016). Kareem Br.8 n.4. Yet, as *Crookston* observed, that case is distinguishable: it involved a law "targeted at ballot selfies," not a "general ban[] on ballot-

exposure." *Crookston*, 841 F.3d at 401. In any event, the First Circuit's analysis in *Rideout* (which occurred before the Supreme Court's analysis in *Mansky*) is highly flawed. Among other problems, the First Circuit did not even engage with whether election ballots are nonpublic forums. True, the district court in *Rideout* briefly considered that issue. *Rideout v. Gardner*, 123 F. Supp. 3d 218, 230–31 (N.H. Dist. 2015). But that court wrongly treated forum analysis as focusing on the geographic space where speech "take[s] place." *Id.* As discussed above (at 26–27), government-controlled forums can include channels of communication, not just physical locations. *See Cornelius*, 473 U.S. at 802; *Rosenberger*, 515 U.S. at 830.

While making too much of other courts' cases, Kareem makes too little of this Court's decision in *Crookston*. Kareem is correct that *Crookston* was a preliminary ruling. *See* Kareem Br.23–25. But it does not follow that *Crookston*'s analysis has no persuasive value. The Court there offered a developed explanation for why it was skeptical of a challenge like Kareem's. *Crookston*, 841 F.3d at 399–400. That earlier skepticism should carry over here.

### B. Kareem fails to identify an alternative regulatory approach that would be less restrictive but as effective.

Kareem's errors continue when she turns to the fit between means and ends. While Kareem seemingly appreciates that Ohio has compelling interests in election

integrity, she disregards the (readily apparent) vote-confirmation dangers that ballot selfies pose.

As an initial matter, Kareem's tailoring arguments cannot escape the "many parallels" between this case and the Supreme Court's decision in *Burson*. *See Crookston*, 841 F.3d at 400. Kareem tries to cabin *Burson*, arguing that the case's reasoning was limited to protecting the physical space around polling places. Kareem Br. 33–34 (citing *Rideout*, 838 F.3d at 73). But the logic in *Burson* was not so narrow. The plurality reasoned that a "restricted zone surrounding the voting area" was "necessary" because of Tennessee's broader need "to preserve the secrecy of the ballot." *Burson*, 504 U.S. at 207–08. Here, restricting ballot exposure bears an even stronger connection to "preserv[ing] the secrecy of the ballot." *Id.* So the analysis from *Burson* applies *a fortiori*. (Contrary to Kareem's suggestion, *see* Kareem Br.33 n.15, the Secretary repeatedly cited *Burson* in moving for summary judgment, Sec'y Mot., R.24, PageID#117–19, 125–26 & n.3, 128.)

Kareem also argues, incorrectly, that there is too little proof that ballot selfies threaten election integrity. *E.g.*, Kareem Br.32. The Court should make "quick work" of this counterintuitive argument. *See Crookston*, 841 F.3d at 400. Ohio has banned ballot exposure for well over a century, so that makes it difficult to definitively prove "what would happen" without the protection. *See Burson*, 504 U.S. at

208 (plurality). Even so, Kareem's arguments ignore the obvious. She is effectively asking this Court to disregard history, *above* 5–15, modern instances of vote buying, *above* 43–46, problems in other countries, *above* 46, uncontroverted expert testimony, Adler Report, R.24-3, PageID#234–56, and the common-sense link between ballot selfies and vote confirmation, *see Crookston*, 841 F.3d at 400. The Court should not do so; even in areas of demanding constitutional scrutiny, judges are not required to bury their heads in the sand.

Perhaps the best sign that Ohio's statutes are well tailored is the lack of a better option. Not even strict scrutiny mandates that States adopt "less effective" alternatives for serving compelling interests. *See Ashcroft v. ACLU*, 542 U.S. 656, 670 (2004). Kareem, however, identifies no better alternative to the challenged statutes. She suggests that Ohio could simply rely on stand-alone prohibitions against bribery and voter intimidation. Kareem Br.38. That approach would be far "less effective" in serving Ohio's compelling election-integrity interests. "Voter intimidation and election fraud are successful precisely because they are difficult to detect." *Burson*, 504 U.S. at 208 (plurality). And ballot selfies—if allowed—would provide a particularly easy, online means of vote confirmation. That, in turn, would leave state officials "practically no reasonable means of detection." Adler Report, R.24-3, PageID#235; *see also id.*, PageID#253.

Kareem's remaining arguments similarly fall short. For example, Kareem notes that Ohio's statutes are phrased to focus on the timeframe immediately surrounding elections. *See* Kareem Br.17. But focusing on that timeframe (when election corruption is most likely to occur) makes Ohio's approach *better* tailored, not worse. As for other available methods of speaking, Kareem greatly exaggerates the uniqueness of ballot selfies. She even suggests at one point that "no alternative[s]" can serve as a substitute for such communication. Kareem Br.43–44. Such hyperbole strains credulity. Any creative social-media user could come up with many comparable ways—whether through pictures, words, or some combination—to share with the world if and how they voted. *See Crookston*, 841 F.3d at 400.

The fact that States have made different policy choices about ballot selfies does not change the constitutional analysis. Such variance is a feature (not a bug) of our federalist system. As Kareem concedes, Ohio is hardly alone in this area; many States restrict ballot selfies. Kareem Br.8 n.6. Other States, like Kentucky, permit ballot selfies. *See* Kareem Br.9. But with all due respect to Ohio's southern neighbor, the Bluegrass State does not have the best track record of stopping vote buying. *Above* 44. The big-picture point is this: by permitting ballot selfies, some States are inviting future election problems (problems that may be incredibly difficult to detect or prove). Ohio is not constitutionally required to follow those States off that bridge.

### C. The District Court did not abuse its discretion in considering the Secretary's expert, and summary judgment was proper regardless.

Professor Adler's expert opinions support Ohio's ballot-secrecy statutes. Contrastingly, there is no expert evidence supporting Kareem. Trying to minimize this discrepancy, Kareem argues that the District Court abused its discretion in considering Professor Adler's opinion. She is wrong once again.

Under Federal Rule of Evidence 702, qualified persons may testify on relevant matters if their testimony is sufficiently reliable. *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 316 (6th Cir. 2019). In determining reliability, courts may consider factors like whether an expert's approach has been tested, subject to peer review, or has a known error rate. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–94 (1993). But reliability is a highly context-dependent inquiry, and the "utility" of these *Daubert* factors is often "limited ... in the context of non-scientific expert testimony." *See First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 334 (6th Cir. 2001). Courts should thus approach reliability through the lens of the "relevant discipline" at issue. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (alterations accepted, quotation omitted). All the while, trial judges have "broad latitude" to assess reliability. *OPERS v. Fed. Home Loan Mortg. Corp.*, 188 F.4th 900, 919 (6th Cir. 2026) (quotation omitted). That is particularly so when they *allow*

testimony: as this Court has repeatedly reminded, "rejection of expert testimony is the exception, rather than the rule." *Id.* (quotation omitted).

Here, the District Court did not abuse its discretion in considering Professor Adler's opinions. Professor Adler is a qualified political scientist. And his opinions about the dangers of ballot selfies are undoubtedly relevant. Professor Adler's opinions are also reliable. He reached them by reviewing history and academic literature. Adler Depo., R.33-1, PageID#711–14. Such review is a "very common" approach in "a field like political science." *Id.* at PageID#715. Considering all this, the District Court's reliability determination was well within the "broad latitude" it should receive. *See OPERS*, 188 F.4th at 919.

Kareem argues otherwise, but not persuasively. She concedes—as she must—that "there is no definitive checklist" for gauging reliability. Kareem Br.27 (quotation omitted). But she nonetheless tries to leverage *Daubert*-like considerations as if they were mandatory factors for all fields. *See* Kareem Br.27–29. Kareem also stresses this Court's decision in *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521 (6th Cir. 2012). But that case involved testimony in a much different field than political science: forensic engineering. *Id.* at 526, 528.

Beyond those mistakes, Kareem greatly oversimplifies Professor Adler's work. Professor Adler did *not* "simply" offer "a few historical anecdotes" to support his

opinions. *Contra* Kareem Br.27. Rather, Professor Adler used historical examples to give shape to this country's broader history of election corruption before ballot-secrecy reforms. *See* Adler Report, R.24-3, PageID#236–40. And Professor Adler showed his work: his report cites over 60 election-related sources, spanning various disciplines. Adler Report, R.24-3, PageID#257–64. By contrast, Professor Adler did *not* concede that his expert report was "simply" his "subjective opinion." *Contra* Kareem Br.29. He instead testified that he produced his report using "very common" methods in his field. Adler Depo., R.33-1, PageID#715.

At day's end, the District Court's consideration of Professor Adler's opinions comes nowhere near an abuse of discretion. But Kareem should lose this case with or without those opinions. The history Professor Adler relied upon is well established and already a part of Supreme Court precedent. *See Mansky*, 585 U.S. at 6–7; *Burson*, 504 U.S. at 200–05 (plurality). And the link between that history, vote buying, vote confirmation, and ballot selfies is basic "common sense." *Crookston*, 841 F.3d at 399–400 (quotation omitted). Professor Adler's opinions supply a "help[ful]" account of how everything fits together. *See* Fed. R. Evid. 702(a). Ohio's statutes, however, survive constitutional review regardless.

## CONCLUSION

The Court should affirm.

Respectfully submitted,

D. ANDREW WILSON
Attorney General of Ohio

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN*
Ohio Solicitor General
**Counsel of Record*
JOHN F. KERKHOFF
Chief Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
Mathura.Sridharan@OhioAGO.gov

*Counsel for Appellee*
*Frank LaRose*

## CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, this brief complies with the type-volume requirements for a principal brief and contains 12,988 words. *See* Fed. R. App. P. 32(a)(7)(B)(i).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity font.

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2026, this brief was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN

## DESIGNATION OF DISTRICT COURT RECORD

Appellants, pursuant to Sixth Circuit Rule 30(g), designate the following filings from the District Court's electronic records:

***Kareem v. Cuyahoga County Board of Elections, et al.*, No. 1:20-CV-2457**

| Date Filed | R. No.; PageID# | Document Description |
|---|---|---|
| 10/30/2020 | R. 1; 1, 3, 8–11 | Complaint |
| 2/28/2022 | R. 24; 94–131 | Ohio Secretary of State's Motion for Summary Judgment |
| 2/28/2022 | R.24-1; 133 | A County Where Selling Votes Is Universal, N.Y. Times, Jan. 15, 1911 |
| 2/28/2022 | R.24-2; 174, 181–85, 193, 204–07 | Redacted Deposition of Alison M. Abdul-Kareem |
| 2/28/2022 | R.24-3; 234–64 | Expert Report of Dr. E. Scott Adler |
| 2/28/2022 | R.24-4; 283 | Statutes of the State of Ohio |
| 2/28/2022 | R.24-6; 300–19 | Ohio Laws |
| 2/28/2022 | R. 26-1; 431 | Deposition of Anthony Perlatti |
| 2/28/2022 | R. 28; 570 | Declaration of Alison Kareem |
| 3/30/2022 | R. 33-1; 711–15 | Deposition of E. Scott Adler |
| 3/31/2023 | R. 40; 1062–75 | Memorandum Opinion and Order |
| 6/3/2026 | R. 52; 1119–47 | Memorandum, Opinion, & Order on Summary Judgment |
| 6/3/2026 | R. 53; 1148 | Judgment Entry |
| 6/9/2026 | R. 54; 1149 | Notice of Appeal |